40 N.J. Super. 238 (1956)
122 A.2d 668
TRINKA SERVICES, INC., A CORPORATION OF NEW JERSEY, AND EDWIN F. TRINKA, PLAINTIFFS,
v.
STATE BOARD OF MORTUARY SCIENCE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided May 7, 1956.
*239 Messrs. Read and Dolliver, attorneys for plaintiffs (Mr. Robert M. Read appearing).
*240 Mr. Grover C. Richman, Jr., Attorney-General of New Jersey, attorney for defendant (Mr. Thomas P. Cook, Deputy Attorney-General, appearing).
HUGHES, J.S.C.
This action, in which the issues have been submitted on a stipulation of fact, challenges the constitutionality of parts of the Mortuary Science Act, chapter 340 of the Laws of 1952 (sec. 1-50), and certain rules adopted by the State Board of Mortuary Science of New Jersey. The ground on which the court is asked to declare its judgment voiding such statutes and rules is based, in the constitutional sense, upon the contention that their requirements, insofar as they forbid the conducting of this business within the corporate frame, are unduly restrictive of private enterprise and property and an improper exercise of the police power. The statute (N.J.S.A. 45:7-33) states a new legislative concept that such science, and the practice of embalming and funeral directing, comprise a profession rather than a business. The sense of the State's contention here, upholding the classification expressed in this legislative fiat, as not merely one of nomenclature but of substance, argues that if the realities of the relationship (of such practitioner to the public) embrace obligations such as those reflected in the lawyer-client or doctor-patient relationship, then the police power extends to their enclosure within the protective and restrictive containment of regulations appertaining to the professions. In such case, the State urges that the statute properly prevents the practice of such as a corporate entity, distinguished in name and fact from the individual identity of the practitioner.
It is obvious that it is the nature of the subject matter and the end to be served that determine the quality and content of the regulatory power, Abelson's, Inc., v. New Jersey State Board of Optometrists, 5 N.J. 412, 420 (1950), and thus an examination of the field of action sought to be regulated is necessary. It seldom has been doubted that the police power extends to the regulation, for the public welfare, of the learned arts, inter alia, to protect the public against *241 ignorance, incapacity, deception and fraud. And insofar as "mortuary science" involves the preparation of human remains for display and interment, involving proficiency in the fields of anatomy, chemistry, cosmetic technique and the like, there is obviously a relationship with the public health and welfare entitling the State, in the exercise of the police power, to surround that practice with rigid requirements of training, education, licensing and like precautions in the public interest.
Of course it is true that the category of the "learned professions," once confined to theology, law and medicine, has broadened "in keeping with the diffusion of scientific learning and the need of specialized knowledge in the functioning of our ever-expanding and complex society." Abelson's, Inc., v. New Jersey State Board of Optometrists, supra. Nevertheless, no case has been called to my attention so classifying undertaking or the mortuary science. Moreover, the technical or scientific work of the funeral director or undertaker is only a fractional part of his effort. Beyond this, as is well known, he provides ("sells," although referred to by him with proper and commendable dignity as an element of his "service") a variety of personal property ranging from the casket to wearing apparel, memorial cards and the like. In this respect, such activity is a trade or business and has often been judicially described as such. Babcock v. Laidlaw, 113 N.J. Eq. 318 (Ch. 1933); Marrocco v. Board of Adjustment of the City of Passaic, 5 N.J. Super. 94 (App. Div. 1949); Labash v. Board of Embalmers, etc., New Jersey, 8 N.J. Super. 260 (App. Div. 1950); Id., 12 N.J. Super. 334 (App. Div. 1951); Frizen v. Poppy, 17 N.J. Super. 390 (Ch. Div. 1952); People v. Ringe, 197 N.Y. 143, 90 N.E. 451, 27 L.R.A., N.S. 528 (Ct. App. 1910); Building Com'r of Town of Brookline v. McManus, 263 Mass. 270, 160 N.E. 887 (Sup. Jud. Ct. 1928); Bond v. Cooke, 237 App. Div. 229, 262 N.Y.S. 199 (App. Div. 1932); Busse & Borgmann Co. v. Upchurch, 60 Ohio App. 349, 21 N.E.2d 349, 352 (Ct. App. 1938); State v. Winneshiek Co-op. Burial Ass'n, 237 Iowa 556, 22 N.W.2d 800, *242 165 A.L.R. 1092 (Sup. Ct. 1946). The admixture of professional and business elements in regulatory statutes has sometimes been encountered, New Jersey State Board of Optometrists v. S.S. Kresge Co., 113 N.J.L. 287 (Sup. Ct. 1934), and separation is practicable. Thus, in the last cited case, the sale of eyeglasses was held to be a transaction outside the scope of the regulatory statute there dealt with, as akin to, but not a part of the practice of optometry. And so within a business as such, it is plainly within the police power to regulate aspects thereof affecting the public health and safety, whether by the exercise of a semi-professional skill or otherwise.
But enveloping these two aspects of the practice of mortuary science, and more challenging to the superficial attention than either the technical preparation of the cadaver, or the commercial furnishing of goods appropriate to the occasion, is a third component. In the public relationship of the funeral director to the family and friends of the decedent there are intimate overtones calling for great skill, diplomacy, sobriety and sensitivity. Among other things, the practitioner arranges for religious services which are incident to most funerals. In his conducting of the public aspects of the funeral, he is looked to for a leadership upon which depend the dignity and propriety of an occasion which, coping with the tragedy and grief of bereavement, is of singular significance to those involved. In the very nature of things all of the public, at one time or another, are in contact with these realities of life and death. And so the State insists here that:
"These factors provide ample justification for a requirement that the relationship between the undertaker and the bereaved ones be made personal, individual and confidential  something which an impersonal corporation is incapable of providing."
While this reasoning is plausible and appealing, it seems to me that the exigencies of this relationship, confined as they are to sentiment, are distinguished from the very tangible dependence of a patient upon his doctor, of a client upon his lawyer, or of the mentally or spiritually disturbed person upon his psychiatrist or clergyman. The *243 vicissitudes of life, health, liberty and such well-being differ from the accouterments of death and the undertaker's dignified dilution of feelings of sorrow and bereavement. Quaere: Is this public relationship of a nature that would justify the police power in requiring that it be exercised only by the individual practitioner, and not by a corporation through its trained, licensed and competent personnel?
It has been said that the police power, as a reserve element of sovereignty, extends beyond the public health, safety and morals in their usual significance, and reaches "action conducive to social well-being." Schmidt v. Board of Adjustment of City of Newark, 9 N.J. 405 (1952). Nevertheless, I am unable to discern the bridge of relationship between even the broadened concept of this power, and the public need upon which its valid exercise depends. I believe that once the State and its Board of Mortuary Science have secured the health and welfare of the public in the usual sense, by its education, licensing and like provisions pertaining to the technical treatment of the human remains, and associated services such as interment, that this is as far as the State can go in regulating what is otherwise a private property right, i.e., the doing of business in the corporate frame. The demeanor and proficiency required in other phases of the funeral director's work, as important and crucial as they may be, have no greater public impact (except for greater proximity in time) than the understanding and honesty of the insurance representative who consults with the survivors as to settlement, or of the banker who consults with the unhappy survivor as to investments, and no one would suggest that these services could not be rendered within the corporate medium.
Unless there be this relationship to the public need, the "corporation" provisions of the statutes and rules involved must be considered as unduly restrictive of the right of private property, and thus an improper exercise of the police power. I must, therefore, declare that they are unconstitutional and void for such reasons and will sign judgment to that effect upon presentation by counsel, on notice or on consent as to form.